UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUSLIM ADVOCATES,<br><br>  Plaintiff,<br><br>  v.<br><br>U.S. DEPARTMENT OF JUSTICE, et al.,<br><br>  Defendants. | Case No. 18-cv-02137-JSC<br><br>**ORDER RE: DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 40 |

Plaintiff Muslim Advocates sues Defendants the U.S. Department of Justice ("DOJ") and the U.S. Department of Homeland Security ("DHS") (collectively, "Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*, for violation of the Information Quality Act, 44 U.S.C. § 3516 ("IQA"). (Dkt. No. 37.)[1]  Now before the Court is Defendants' motion to dismiss the first amended complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and, alternatively, pursuant to Rule 12(b)6) for failure to state a claim upon which relief may be granted.[2]  (Dkt. No. 40.)  After careful consideration of the parties' briefing, and having had the benefit of oral argument on June 20, 2019, the Court GRANTS Defendants' Rule 12(b)(6) motion because Plaintiff's claim premised on alleged violations of the IQA is not subject to judicial review under the APA.

//

//

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos.

# BACKGROUND

## I. Relevant Statutory and Factual Background[3]

### A. The Information Quality Act and Implementing Guidelines

The IQA "was included as a brief note to the Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000)," (codified at 44 U.S.C. 3516 note (Paperwork Reduction Act Guidelines)). *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1145 (9th Cir. 2015). The statute directs the Office of Management and Budget ("OMB") to "'issue guidelines . . . that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies in fulfillment of the purposes and provisions of . . . the Paperwork Reduction Act.'" *Id.* (quoting 44 U.S.C. 3516 note). The IQA's focus "is on the quality of information shared by federal agencies, and on ensuring broad access to information." *Id.* at 1148.

The IQA directs that the content of OMB's guidelines shall:

> (1) apply to the sharing by Federal agencies of, and access to, information disseminated by Federal agencies; and
>
> (2) Require that each Federal agency to which the guidelines apply—
>
>   (A) issue guidelines ensuring and maximizing the quality,

---

[3] Courts ordinarily do not look beyond the four corners of the complaint when considering a motion to dismiss. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Under Federal Rule of Evidence 201(b), "court[s] may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Here, the complaint includes as exhibits correspondence to and from DOJ and DHS regarding the government report at issue and Plaintiff's subsequent request for correction of that report under the IQA. (Dkt. No. 37, Exs. A-N.) Thus, those documents are properly before the Court. Defendants request that the Court also "take judicial notice of the Initial Section 11 Report, which is available on the DHS website," and cited in the FAC. (Dkt. No. 40 at 14 n.1 (citing Dkt. No. 37 at ¶ 38 n.8).) Because the Section 11 Report is cited in the complaint and indeed forms the basis for Plaintiff's APA claim, it is properly before the Court under the incorporation-by-reference doctrine. Further, the Section 11 Report is judicially noticeable under Rule 201(b). *See Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (noting that district courts may take judicial notice of "[r]ecords and reports of administrative bodies").

> objectivity, utility, and integrity of information (including statistical information) disseminated by the agency, by not later than 1 year after the date of issuance of the guidelines under subsection (a);
>
> (B) establish administrative mechanisms allowing affected persons to seek and obtain correction of information maintained and disseminated by the agency that does not comply with the guidelines issued under subsection (a); and
>
> (C) Report periodically to the director—
>
> > (i) the number and nature of complaints received by the agency regarding the accuracy of information disseminated by the agency; and
> >
> > (ii) how such complaints were handled by the agency

44 U.S.C. 3516 note.  The IQA does not expressly provide for judicial review of information disseminated by Federal agencies, or otherwise provide a private right of action.

### 1.     OMB Guidelines

OMB issued its final guidelines pursuant to the IQA in February 22, 2002.  *See* Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies, 67 Fed. Reg. 8452 (Feb. 22, 2002).  The guidelines set forth four central duties that agencies must undertake: (1) "adopt a basic standard of quality (including objectivity, utility, and integrity)" that is "to be ensured and established at levels appropriate to the nature and timeliness of the information . . . disseminated," as well as specific quality standards "for the various categories of information"; (2) develop a quality review process to ensure the "objectivity, utility, and integrity[ ] of information before it is disseminated"; (3) "establish administrative mechanisms allowing affected persons to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines," as well as "an administrative appeal process" for "requests for reconsideration" of agency decisions; and (4) submit to OMB a report detailing the agency's information quality guidelines and thereafter submit a yearly report regarding any complaints the agency receives related to its compliance with OMB's Guidelines.  67 Fed. Reg. at 8458-59.

//

//

### 2. DOJ Guidelines

DOJ issued its guidelines ("DOJ Guidelines") in October 2002 in response to OMB's directive. *See* U.S. Dep't of Justice, DOJ Information Quality Guidelines, https://www.justice.gov/information-quality. The DOJ Guidelines track the language of the OMB Guidelines, stating, in pertinent part that they "will adhere to the basic standards cited in the final OMB Guidelines and focus on the following areas": (1) "adopt[ing] a basic standard of quality (including objectivity, utility, and integrity); (2) develop[ing] a process for reviewing the quality . . . of information before it is disseminated; and (3) establish[ing] administrative mechanisms allowing affected persons (individual or entity that may use, benefit, or be harmed by the disseminated information at issue) to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *Id.*

The DOJ Guidelines specify that those requesting correction of information "bear the 'burden of proof' with respect to the necessity for correction as well as with respect to the type of correction they seek." *Id.* DOJ will review such requests, and "[a]fter it has completed its review, DOJ will determine whether a correction is warranted, and, if so, what corrective action it will take." *Id.* Further:

> Any corrective action will be determined by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information and the magnitude of the error. DOJ is not required to change, or in any way alter, the content or status of information simply based on the receipt of a request for correction.

*Id.* The DOJ Guidelines provide that the agency "will normally respond to requests for correction of information within 60 calendar days of receipt," and "will inform the requester that more time is required" if necessary. *Id.* If a petitioner disagrees with the agency's determination, it can file a request for reconsideration; DOJ will respond to such requests "within 45 calendar days of receipt." *Id.*

As to their scope, the DOJ Guidelines expressly state:

> These guidelines are not a regulation. They are not legally enforceable

> and do not create any legal rights or impose any legally binding requirements or obligations on the agency or the public. Nothing in these guidelines affects any otherwise available judicial review of agency action.

*Id.*

### 3. DHS Guidelines

The DHS guidelines ("DHS Guidelines") became effective on March 18, 2011. *See* U.S. Dep't of Homeland Security, Information Quality Guidelines 1 (2011), https://www.dhs.gov/sites/default/files/publications/dhs-iq-guidelines-fy2011.pdf. The DHS Guidelines track the DOJ Guidelines in that they "adhere to the basic standards cited in the OMB guidelines and focus on the [same basic] areas."[4] *Id.* at 2. The DHS Guidelines further track the DOJ Guidelines regarding requests for correction; specifically, they provide that: (1) the burden is on the petitioner to demonstrate that the information does not comply with the DHS or OMB Guidelines; (2) DHS Components "should respond to requests for correction" within 60 days of receipt, and notify the petitioner if the request "requires an extended period of time for processing"; and (3) DHS components "should develop an administrative appeals process" regarding requests for correction and respond to such appeals within 60 days. *Id.* at 6, 8. Further:

> In making determinations of whether or not to correct information, [DHS] Components may reject claims made in bad faith or without justification. [DHS] Components need undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved and explain such practices in their annual fiscal year reports to DHS.

*Id.* at 6. Also like the DOJ Guidelines, the DHS Guidelines expressly limit their enforceability:

> The guidelines are not intended to be, and should not be construed as, legally binding regulations or mandates. These guidelines are intended only to improve the internal management of DHS and, therefore, are not legally enforceable and do not create any legal rights or impose any legally binding requirements or obligations on the

---

[4] As with the DOJ Guidelines, the stated focus of the DHS Guidelines is on: (1) "a basic standard of quality (including objectivity, utility, and integrity)"; (2) developing "a process for reviewing the quality . . . of information before it is disseminated"; and (3) establish[ing] administrative mechanisms allowing affected persons (individual or entity that may use, benefit, or be harmed by the disseminated information at issue) to seek and obtain, where appropriate, timely correction of information maintained and disseminated by the agency that does not comply with OMB or agency guidelines." *See* U.S. Dep't of Homeland Security, Information Quality Guidelines 2 (2011), https://www.dhs.gov/sites/default/files/publications/dhs-iq-guidelines-fy2011.pdf.

agency or the public.  Nothing in these guidelines affects any available judicial review of agency action.

*Id.*

### B.     Executive Order No. 13780

On March 6, 2017, the President of the United States signed Executive Order No. 13780, Protecting the Nation from Foreign Terrorist Entry into the United States.  82 Fed. Reg. 13209 (Mar. 6, 2017).  The order "temporarily restricted the entry (with case-by-case waivers) of foreign nationals from six countries"—Iran, Libya, Somalia, Sudan, Syria, and Yemen—"because each 'is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2404 (2018) (quoting Exec. Order No. 13780, § 1(d), 82 Fed. Reg. at 13210).  Section 11 of the order directed "the Secretary of Homeland Security, in consultation with the Attorney General," to "collect and make publicly available the following information" for purposes of public transparency:

> (i) information regarding the number of foreign nationals in the United States who have been charged with terrorism-related offenses while in the United States; convicted of terrorism-related offenses while in the United States; or removed from the United States based on terrorism-related activity, affiliation with or provision of material support to a terrorism-related organization, or any other national-security-related reasons;
>
> (ii) information regarding the number of foreign nationals in the United States who have been radicalized after entry into the United States and who have engaged in terrorism-related acts, or who have provided material support to terrorism-related organizations in countries that pose a threat to the United States;
>
> (iii) information regarding the number and types of acts of gender-based violence against women, including so-called "honor killings," in the United States by foreign nationals; and
>
> (iv) any other information relevant to public safety and security as determined by the Secretary of Homeland Security or the Attorney General, including information on the immigration status of foreign nationals charged with major offenses.

Exec. Order No. 13780, § 11, 82 Fed. Reg. at 13217.

### C.     The Section 11 Report

As directed, in January 2018 DOJ and DHS issued a joint report responsive to Section 11 of the Executive Order.  *See* U.S. Dep't of Justice & U.S. Dep't of Homeland Sec., Executive

Order 13780: Protecting the Nation From Foreign Terrorist Entry Into the United States, Initial Section 11 Report (Jan. 2018) (the "Report").[5]  The Report notes, in pertinent part:

> [S]ubsequent to the issuance of Executive Order 13780, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) worked collaboratively to provide information responsive to the requirements of Section 11. Unless specified otherwise, this initial report includes information for the period from September 11, 2001 until the date of issuance. Notably, however, because of previous information collection and reporting practices of DHS and DOJ, some of the information provided in this initial report does not capture the full spectrum of statistics envisioned by Executive Order 13780. DHS and DOJ will endeavor to provide additional information in future reports issued pursuant to the requirements of Executive Order 13780.

*Id.* at 1.  The Report addresses the four previously-discussed substantive categories of information outlined in the Executive Order.  *See id.* at 2-10.

### D. Plaintiff's Request for Correction

Plaintiff petitioned DOJ and DHS for correction of the Report on January 29, 2018.  (Dkt. Nos. 37 at ¶ 85 & 37-2, Ex. B.)  The petition cites five categories of information as deliberately misleading and biased and thus in violation of the IQA.  First:

> Section 11 directed the Departments to provide information related to foreign nations and terrorism-related offenses, which the Executive Order claimed would be used to inform the country's immigration policy.  Instead, the Report provided information regarding foreign-born individuals rather than foreign nationals, which allows it to attribute 73 percent of international terrorism-related offenses to individuals who the Departments apparently perceive as foreign, despite their American citizenship.

(Dkt. No. 37-2, Ex. B at 7.)  Second, "[t]he Report's substitution of international terrorism for all terrorism misleadingly ignores domestic terrorism, artificially inflating the proportion of terrorist incidents committed by foreign nationals." (*Id.* at 8.)  Third, "[t]he Report's inclusion of individuals who committed terrorism overseas and whose only apparent tie to the United States is extradition to the United States for prosecution." (*Id.* at 9.)  Fourth, "[t]he Report's examples of

---

[5] https://www.dhs.gov/sites/default/files/publications/Executive%20Order%2013780%20Section%2011%20Report%20-%20Final.pdf

7

foreign nationals charged with or convicted of terrorism-related offenses are misleading and perpetuate the Administration's discriminatory narrative that Muslims are likely to commit acts of terrorism." (*Id.* at 10.) Finally, "[t]he Report's information relating to gender-based violence is misleading and perpetuates anti-Muslim stereotypes." (*Id.* at 11.) Plaintiff asserted that it was an "affected person" under the terms of the agency guidelines, and requested that DOJ and DHS retract the Report, and if necessary, publish a revised Report correcting the deficiencies noted by Plaintiff. (*Id.* at 12-13.)

DOJ and DHS separately responded in writing to Plaintiff's petition on June 15, 2018, and June 19, 2018, respectively, notifying Plaintiff that its request for correction was under review. (Dkt. Nos. 37-3, Ex. C & 37-4, Ex. D.) DOJ issued its denial on July 31, 2018, addressing each of Plaintiff's five categories of concern, "determin[ing] that there is no inconsistency with the IQA Guidelines," and "conclud[ing] that neither retraction nor correction of [the Report] is required under the IQA Guidelines." (Dkt. No. 37-5, Ex. E at 4.) The denial letter notes Plaintiff's right to request reconsideration. (*Id.*)

DHS denied Plaintiff's request for correction by letter dated August 1, 2018. (Dkt. No. 37-6, Ex. F.) The letter asserts in part that Plaintiff based "much of" its request for correction "not on the data in the Report itself, but on [Plaintiff's] differing interpretation of that data, which do[es] not warrant correction under the Department's IQA guidelines." (*Id.* at 3.) Thus, DHS "conclude[d] that neither retraction nor correction of information in the [Report] is warranted." (*Id.*) DHS noted, however, that it would "take the points raised in [Plaintiff's] request into consideration in the preparation of future reports." (*Id.*) The letter further notes Plaintiff's "right to an administrative appeal." (*Id.* at 4.)

### E. Plaintiff's Requests for Reconsideration

On September 13, 2018, Plaintiff filed separate but identical requests for reconsideration of the DOJ and DHS denials, asserting that "[t]he Report must be corrected because the information it presents inflates the proportion of terrorist events that it can attribute to immigrants, especially Muslim men," and restating that the five previously-discussed categories information are misleading and do not meet IQA standards. (Dkt. Nos. 37-7, Ex. G at 2-13 & 37-8, Ex. H at 2-

13.) DOJ and DHS issued interim responses on October 24, 2018, and November 7, 2018, respectively, indicating that Plaintiff's request for reconsideration was under review. (Dkt. Nos. 37-9, Ex. I & 37-11, Ex. K.)

DOJ denied Plaintiff's request for reconsideration by letter dated December 21, 2018. (Dkt. No. 37-10, Ex. J.) DOJ's denial letter addresses each of Plaintiff's "five general areas of concern regarding the Report," and states, in pertinent part:

> [T]he Department concludes on reconsideration that information in the Report could be criticized by some readers, consistent with some of the concerns voiced in your Request for Reconsideration. However, the Department also concludes that it was sufficiently transparent in its presentation of information, and as a result, the Report should not be withdrawn or corrected. Working closely with DHS, the Department will consider IQA principles in issuing future reports under Section 11 of Executive Order 13780 to better present such information to the public.

(*Id.* at 2.)

On December 19, 2018, DHS notified Plaintiff that DHS needed additional time to "review and respond" to Plaintiff's request for reconsideration. (Dkt. No. 37-12, Ex. L at 2.) DHS notified Plaintiff on January 31, 2019 that further time was required due to a lapse in appropriations. (Dkt. No. 37-13, Ex. M at 2.) On February 14, 2019, DHS denied Plaintiff's request for reconsideration. (Dkt. No. 37-14, Ex. N.) DHS's denial letter addresses Plaintiff's five areas of concern, and states, in pertinent part:

> The Department has conducted an independent review of your Request for Reconsideration and concludes that, while it will take into consideration in future Section 11 Reports those points raised in both your Requests for Correction and Reconsideration, the Section 11 Report was sufficiently transparent in its presentation of the information and meets the IQA guidelines. It therefore declines to withdraw or correct it.

(*Id.* at 2.)

## II. Complaint Allegations and Requested Relief

Plaintiff is a civil rights organization located in Washington, D.C. (Dkt. No. 37 at ¶ 12 n.1.) It "promotes freedom and justice for Americans of all faiths, with a particular focus on issues impacting Muslim communities." (*Id.*) In carrying out its mission, Plaintiff "engages in civil rights litigation, policy advocacy, and public education to fight inaccurate stereotypes about

Muslims and other immigrants." (*Id.*)

The gravamen of the FAC is that the Report "fails the objectivity and utility requirements" of "[t]he IQA, OMB's IQA Guidelines, and DOJ and DHS's IQA Guidelines," and instead "presents information in a deceptive, misleading, and incomplete manner, and in so doing, mispresents the actual terror threat to the country, artificially inflating the threat that immigrants and Muslims pose to the United States."[6] (*Id.* at ¶¶ 108, 110; *see also id.* at ¶¶ 4-7, 41-84.) As a result, "Defendants' ongoing dissemination of the Report following their denials of Plaintiff['s] Petition and Appeal Petitions violates the IQA and its implementing Guidelines, and is therefore arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and otherwise violative of the APA, 5 U.S.C. § 706(2)." (*Id.* at ¶ 111.)

Plaintiff seeks the following relief: (1) declarations "that the Report disseminates information that fails the standard of quality required of federal agencies," and "that Defendants violated the IQA, its implementing Guidelines, and the APA"; (2) an order requiring "Defendants to expressly retract or correct the Report and to cease dissemination of the Report"; (3) attorneys' fees and costs of suit; and (4) "such other relief as the Court may deem just and proper." (*Id.* at 32.)

### III. Procedural History

Plaintiff filed its original complaint on April 9, 2018, asserting a claim under the APA for violation of the IQA. (Dkt. No. 1.) Defendants moved to dismiss the complaint on the same grounds asserted in the instant motion. (*See* Dkt. No. 21). The parties then filed a stipulation to stay the case pending Plaintiff's administrative appeals, (Dkt. No. 25), which the Court granted, (Dkt. No. 26). Plaintiff filed the FAC after completing the administrative appeals process, (Dkt.

---

[6] Although the FAC contains allegations regarding Defendants' processing of Plaintiff's IQA requests for correction and reconsideration, (*see* Dkt. No. ¶¶ 9, 90, 92-93, 99-105 (alleging inadequate or tardy responses to Plaintiff's petitions)), the thrust of Plaintiff's claim concerns the *content* of the Report, (*see id.* at ¶ 11 (noting that despite Plaintiff's IQA petitions, "Defendants declined to retract or correct the Report, and instead continue to disseminate it. In doing so they violate the IQA and its implementing Guidelines.")). Plaintiff's requested relief further indicates that Plaintiff's claim is based on the content of the Report and not inadequate processing of Plaintiff's petitions, (*see id.* at 32 (seeking injunctive relief requiring "Defendants to expressly retract or correct the Report and to cease dissemination of the Report")).

1   No. 37), and Defendants filed the instant motion to dismiss, (Dkt. No. 40). The motion is fully
2   briefed, (*see* Dkt. Nos. 41 & 44), and the Court heard oral argument on June 20, 2019.

**DISCUSSION**

Defendants argue that dismissal is warranted pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because: (1) Plaintiff lacks standing; specifically, Plaintiff fails to satisfy the injury-in-fact prong; (2) the IQA does not confer any legal rights and thus Plaintiff does not have a right of action under the statute; and (3) Plaintiff's claim is not subject to judicial review under the APA. (*See* Dkt. No. 40 at 22-30.) Defendants argue in the alternative that dismissal is warranted under Rule 12(b)(6) because Plaintiff fails to state a claim for relief under the APA. The Court addresses dismissal only in the context of Rule 12(b)(6) because Defendants' standing arguments are intertwined with their 12(b)(6) arguments, and even if Plaintiff was to satisfy Article III standing requirements, Plaintiff fails to state a claim under the APA.

### A.   Plaintiff Fails to State a Claim Under the APA

There is no dispute that the IQA does not provide a private right of action; thus, Plaintiff brings its challenge under the APA. *See Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1090-91 (E.D. Cal. 2010) ("A party challenging an administrative agency's compliance with a substantive statute that lacks an internal private right of action must seek judicial review under the APA.") (citing *Lujan*, 497 U.S. at 882). Pursuant to the APA, a plaintiff may seek judicial review of agency action that is either "made reviewable by statute" or constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants assert that there is no judicial review of agency IQA decisions under the APA because: (1) the IQA precludes judicial review; (2) IQA determinations are "committed to agency discretion"; and (3) such determinations do not constitute final agency action for APA purposes. (Dkt. No. 40 at 27-30.)

#### 1.   Judicial Review is Precluded under 5 U.S.C. § 701(a)(2)

Judicial review is precluded under the APA when the "challenged agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In general, Section 701(a)(2) precludes judicial review "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S.

11

1  812, 830 (1985). Thus, courts must "consider the language of the statute and whether the general

2  purposes of the statute would be endangered by judicial review." *Pinnacle Armor, Inc. v. United

3  States*, 648 F.3d 708, 719 (9th Cir. 2011) (internal quotation marks and citation omitted).

4        Here, neither the IQA nor its implementing guidelines provide judicially manageable

5  standards "against which to judge an agency's exercise of discretion" in deciding whether to grant

6  an IQA request for correction. *See Heckler*, 470 U.S. at 830. The IQA itself directs OMB to issue

7  guidelines to Federal agencies to aid them in ensuring "the quality, objectivity, utility, and

8  integrity" of disseminated information. 44 U.S.C. § 3516 note. The IQA provides no substantive

9  standards as to those terms. The statute further directs OMB to require Federal agencies to issue

10  their own guidelines that comply with OMB's guidelines and set forth agency-specific

11  "administrative mechanisms allowing affected persons to seek and obtain correction of

12  information maintained and disseminated by the agency that does not comply with the [OMB]

13  guidelines." *Id.* Again, the statute itself does not provide standards regarding those administrative

14  mechanisms.

15        Pursuant to the IQA, the OMB Guidelines direct agencies, in pertinent part to "establish

16  administrative mechanisms allowing affected persons to seek and obtain, ***where appropriate***,

17  timely correction of information maintained and disseminated by the agency that does not comply

18  with OMB or agency guidelines." 67 Fed. Reg. at 8459 (emphasis added). Further, the OMB

19  Guidelines provide that the agencies' "administrative mechanisms shall be *flexible*, [and]

20  appropriate to the nature and timeliness of the disseminated information." *Id.* (emphasis added).

21  As to the IQA request determination, the Guidelines state:

22        Agencies, in making their determination of whether or not to correct
information, may reject claims made in bad faith or without
23        justification, and ***are required to undertake only the degree of
correction that they conclude is appropriate for the nature and
24        timeliness of the information involved***.

25  *Id.* at 8458 (emphasis added). The OMB Guidelines' use of discretionary language (i.e., "where

26  appropriate," "flexible," "that they conclude is appropriate") provides for complete agency

27  discretion in determining whether to even consider—much less grant—a party's IQA request for

28  correction.

The DOJ and DHS guidelines likewise provide no judicially manageable standards by which to assess the propriety of their IQA determinations. The guidelines instead track the OMB Guidelines and provide similar discretionary language regarding agency determinations of requests for correction. *See* DOJ Guidelines ("Any corrective action will be determined by the nature and timeliness of the information involved and such factors as the significance of the error on the use of the information and the magnitude of the error. DOJ is not required to change, or in any way alter, the content or status of information simply based on the receipt of a request for correction."); DHS Guidelines at 6 ("[DHS] Components need undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved and explain such practices in their annual fiscal year reports to DHS.").

Plaintiff asserts that the OMB Guidelines and relevant agency guidelines "set forth precise and detailed definitions of the statute's information quality watchwords: 'quality', 'utility'; 'objectivity'; and 'integrity'" that "provide[ ] meaningful standards for courts to apply to evaluate whether an agency has properly reviewed a petition for correction." (Dkt. No. 41 at 9, 21 (quoting 67 Fed. Reg. at 8459-60).) The Court disagrees.

Although the OMB and relevant agency guidelines contain defined terms, those terms alone do not create judicially manageable standards by which a court can determine the propriety of an agency's decision regarding a petition for correction. Instead, the OMB Guidelines' broad language regarding an agency's discretion in considering requests for correction demonstrates that the application of such terms to a specific request is not a mechanical process but instead depends upon the "nature and timeliness of the information involved." *See* 67 Fed. Reg. at 8458 (providing that agencies "are required to undertake only the degree of correction that they conclude is appropriate for the nature and timeliness of the information involved"). And as previously discussed, the DOJ and DHS Guidelines provide near verbatim discretionary language regarding when correction is necessary. Such language does not lend itself to judicial review.

Plaintiff further argues that "the structure and purpose of the IQA provide an additional standard against which the Court can consider Plaintiff's APA claim." (Dkt. No. 41 at 23 (citing *Page v. Donovan*, 727 F.2d 866, 868 (9th Cir. 1984) ("Even if the statute is drawn broadly, review

13

is not precluded if the legislative history offers standards that a reviewing court can apply.")).) Plaintiff asserts that it is implicit in the IQA "that agencies cannot exercise their discretion in a manner that renders the rights of 'affected persons' illusory." (*Id.* (citing 44 U.S.C. § 3516 note).) As the Court previously concluded, however, the IQA creates no enforceable *legal* rights to information or its correctness; thus, any procedural right created by the IQA's directive that OMB issue guidelines requiring federal agencies to "establish administrative mechanisms allowing affected persons to seek and obtain correction of information," *see* 44 U.S.C. § 3516 note, is not tethered to a legal interest. If the IQA creates no enforceable legal right to information or its correctness, then it follows that the "structure and purpose" of the IQA does not create judicially manageable standards by which to judge an agency's decision regarding a request for correction.

The Court's conclusion that judicial review is precluded under § 701(a)(2) is in line with other courts that have squarely addressed IQA-based APA claims and concluded that the merits of such claims are not reviewable. *See, e.g., Harkonen v. U.S. Dep't of Justice*, No. C-12-629 CW, 2012 WL 6019571, at *16 (N.D. Cal. Dec. 3, 2012) ("[T]he IQA and agency guidelines grant sufficient discretion to the DOJ to preclude judicial review under the APA."), *aff'd on other grounds*, 800 F.3d 1143 (9th Cir. 2015); *Salazar*, 749 F. Supp. 2d at 1092-95 (finding IQA-based APA claim precluded from judicial review under § 701(a)(2)); *Ams. for Safe Access v. U.S. Dep't of Health & Human Servs.*, No. C 07-01049 WHA, 2007 WL 4168511, at *4 (N.D. Cal. Nov. 20, 2007) ("[T]he IQA and OMB guidelines do not create a duty to perform legally required actions that are judicially reviewable."), *aff'd on other grounds*, 399 F. App'x 314 (9th Cir. 2010); *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 602 (E.D. Va. 2004) (finding judicial review under the APA precluded on § 701(a)(2) grounds), *aff'd on other grounds sub nom. Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006); *In re Operation of the Missouri River Sys. Litig.*, 363 F. Supp. 2d 1145, 1175 (D. Minn. 2004) (same), *aff'd in part and vacated in part on other grounds*, 421 F.3d 618 (8th Cir. 2005).

The cases cited by Plaintiff do not counsel a different result. (*See* Dkt. No. 41 at 17, 19 (citing *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 678 n.25 (7th Cir. 2016); *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1151 (9th Cir. 2015); *Prime Time Int'l Co. v. Vilsack*, 599

14

F.3d 678, 686 (D.C. Cir. 2010)).)  In *Zero Zone*, the plaintiffs challenged the U.S. Department of Energy ("DOE") "decisionmaking process and substance of . . . final rules" regarding "the energy efficiency of commercial refrigeration equipment."  832 F.3d at 660-61.  The plaintiffs argued that the DOE's rulemaking violated, in part, the Energy Policy and Conservation Act and the court analyzed the action under the APA.  *See id.* at 667-68.  The plaintiffs also framed one issue, which the court discussed as an "alternative" argument, "as a violation of the Information Quality Act."  *Id.* at 678 n.25.  The court noted, in a footnote:

> [The plaintiffs] frame this issue as a violation of the Information Quality Act.  *See* 44 U.S.C. § 3516 note (a).  However, "almost every court that has addressed an Information Quality Act challenge has held that the statute 'creates no legal rights in any third parties.'"  *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 184 (D.C. Cir. 2015) (quoting *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006)).  That being said, the APA still affords the petitioners the right to bring this challenge.

*Id.*  Plaintiff here cites *Zero Zone* for the proposition that "[m]ultiple Circuit Courts have concluded that that IQA claims raised under the APA may be adjudicated."  (*See* Dkt. No. 41 at 17.)  Nothing supports such an expansive reading of the *Zero Zone* footnote, however, which contains that court's lone reference to the IQA.  It appears instead that the *Zero Zone* court analyzed the particular issue characterized by the plaintiff as a violation of the IQA in the context of the plaintiff's overriding challenge to DOE's rulemaking, which falls under the APA.  Further, and most importantly, the *Zero Zone* court did not do what Plaintiff asks the Court to do here: reach the *merits* of an IQA challenge under the APA by deciding whether an agency's determination regarding a request for correction comports with the text of the IQA and its implementing guidelines.

The Ninth Circuit's decision in *Harkonen* is similarly unhelpful to Plaintiff.  There the plaintiff filed an IQA request for correction with DOJ regarding press releases it issued detailing the plaintiff's conviction for wire fraud.  800 F.3d at 1147.  DOJ denied the plaintiff's request initially and on reconsideration, asserting that press releases were excluded from coverage under the DOJ Guidelines.  *Id.*  The plaintiff filed suit under the APA, claiming that DOJ's denial of his request for correction under the IQA and "the exclusion of press releases from DOJ's and OMB's

15

1    [IQA] Guidelines" were arbitrary and capricious, an abuse of discretion, and contrary to law." *Id.*
2    The district court granted the defendants' motion to dismiss, noting that "[c]ourts that have
3    reviewed the IQA have uniformly found that it 'does not create any legal right to information or its
4    correctness.'" 2012 WL 6019571 at *11 (collecting cases). The district court thus concluded that
5    there was no final agency action for purposes of an APA claim, and that judicial review was
6    precluded under 5 U.S.C. § 701(a)(2). *Id.* at *11-17.

7    On appeal, the plaintiff and defendants set forth the exact arguments at issue here;
8    specifically, the plaintiff asserted that "the IQA imposes an obligation on the DOJ to correct
9    information disseminated by the agency, and creates a right under the APA to judicial review of
10   DOJ decisions not to correct this information." 800 F.3d at 1148. The defendants "argue[d] that
11   the IQA does not authorize courts to review the correctness of information disseminated by an
12   agency." *Id.* The Ninth Circuit did not reach those arguments, however, and instead noted that its
13   "review must begin with the threshold question of whether OMB and DOJ had the authority to
14   exclude press releases from the coverage of the IQA guidelines." *Id.* at 1149. In doing so, the
15   *Harkonen* court expressly did *not* address the issue presented here, noting that "[w]e have no
16   reason in this case to reach the broad question of whether the IQA confers upon a private
17   individual the right to seek judicial review of the correctness of all information published by the
18   government." 800 F.3d at 1148. The court analyzed "[w]hether OMB's and DOJ's decisions to
19   exclude press releases from the coverage of the IQA guidelines were within their authority" using
20   the two-step test established by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837
21   (1984), and concluded that OMB and DOJ did have such authority and that the press release at
22   issue was properly excluded from coverage. *Id.* at 1149-51. Thus, the court did not reach the
23   merits of the plaintiff's IQA-based APA claim but instead determined that the information at issue
24   did not fall under the IQA's coverage.

25   Plaintiff's reliance on *Prime Time* is similarly unavailing. There the plaintiff "sought
26   disclosure and correction under the IQA of the data that [the U.S. Department of Agriculture
27   ("USDA")] used to calculate" its "quarterly assessments on tobacco manufacturers and importers"
28   pursuant to the Fair and Equitable Tobacco Reform Act ("FETRA"), 7 U.S.C. § 518d(b).  599

16

F.3d at 680, 685. USDA did not respond to the plaintiff's IQA requests, and plaintiff filed suit directly under the IQA and under the APA. *Single Stick, Inc. v. Johanns*, 601 F. Supp. 2d 307, 311-12 (D.D.C. 2009), *aff'd in part and rev'd in part, Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678 (D.C. Cir. 2010). The district court dismissed the plaintiff's "claim that USDA's failure to respond to requests for disclosure and 'correction' of the data underlying the assessments violated the [IQA] . . . , ruling that the IQA did not vest any party with the right to disclosure and correction and that USDA's failure to respond did not constitute final agency action subject to judicial review under the [APA]." 599 F.3d at 682.

On appeal, USDA argued that the FETRA assessments were excluded from IQA coverage under both the OMB and agency guidelines because the assessments constituted "adjudicative proceedings." *Id.* at 685. The D.C. Circuit first determined that OMB properly "exercised its discretion to exclude documents prepared and distributed in the context of adjudicative proceedings" in its interpretation of the IQA. *Id.* at 685 (citing *Chevron*, 467 U.S. at 843). As to the merits of the plaintiff's IQA claim, the court determined that the underlying agency action—FETRA assessments—were adjudicative proceedings and thus subject to APA review under the Fair and Equitable Tobacco Reform Act, 7 U.S.C. § 518d(i), (j). *Id.* at 686 (concluding that the plaintiff had "rights to an administrative appeal and judicial review") (citing 5 U.S.C. § 551(7) (defining "adjudication") and 7 U.S.C. § 518d(i), (j)). In other words, the court did *not* conclude that the IQA provides a right to review under the APA, but instead found that review is proper under FETRA and the APA. *See also Salazar*, 749 F. Supp. 2d at 1096-1100 (concluding that *Prime Time* does not support that "the IQA provides a right to judicial review" under the APA); *Harkonen*, 2012 WL 609571, at *12 ("*Prime Time* does not support that . . . the court found there was a right to review under the APA."). The *Prime Time* court thus "affirm[ed] the dismissal of the IQA challenge, although on a different ground than relied upon by the district court." *Id.* at 686.

Simply put, Plaintiff cites no case in which a court has done what Plaintiff asks this Court to do—adjudicate the merits of an IQA-based APA claim premised on an agency's failure to grant a petition for correction. Conversely, courts that have addressed the issue of APA claims

17

1  premised on alleged IQA violations have "uniformly found" that such claims are precluded from
2  judicial review. *See Harkonen*, 2012 WL 6019571 at *11 (collecting cases). That authority is
3  persuasive, and the Court follows it here.
4  In any event, as discussed below, even if the IQA's implementing guidelines did provide
5  judicially manageable standards, Plaintiff's claim would still fail to state a cause of action under
6  the APA.

### 2. No "Final Agency Action" for Purposes of an APA Claim

As previously discussed, the APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Determining whether an agency action is "final" is a two-step process. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The action must first "mark the consummation of the agency's decisionmaking process." *Id.* (internal quotation marks and citation omitted). Next, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks and citation omitted). In general, "administrative orders are not final and reviewable unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 (9th Cir. 1990) (internal quotation marks and citation omitted). Defendants argue that Section 704 forecloses judicial review of Plaintiff's IQA claim because Defendants' decisions regarding Plaintiff's requests for correction are not "actions from which legal consequences will flow." (Dkt. No. 40 at 30.) The Court agrees.

Plaintiff asserts that Defendants' "final denials determined rights and obligations" because the IQA and its implementing guidelines confer a procedural right that entitles petitioners to "'seek and obtain correction'" of disseminated information "that is not of sufficient 'quality,' 'objectivity,' 'utility,' or 'integrity.'" (Dkt. No. 41 at 24 (quoting 44 U.S.C. § 3516 note (b)(2)(B)).) Plaintiff fails to show, however, that a procedural right to petition for correction of information is tethered to any legal consequences or obligations that flow from Defendants' denials of Plaintiff's requests for correction. Indeed, courts have rejected similar arguments that the IQA and its implementing guidelines implicate legal rights or cause legal consequences for

purposes of an APA claim, finding instead that the IQA "does not create any legal right to information or its correctness." *See, e.g., Harkonen*, 2012 WL 6019571, at *11 ("Courts that have reviewed the IQA have uniformly found that it 'does not create any legal right to information or its correctness.') (collecting cases); *Salazar*, 749 F. Supp. 2d at 1103 (finding that "[t]he IQA creates no enforceable legal rights at all"); *Salt Inst. v. Leavitt*, 440 F.3d 156, 159 (4th Cir. 2006) (affirming dismissal of IQA-based APA claim and finding the IQA "does not create any legal right to information or its correctness"). Plaintiff cites no case in which a court has held that an agency's final denial of an IQA request for correction constitutes final agency action for APA purposes.

To the extent that Plaintiff was entitled to petition for the correction of information under the IQA and its implementing guidelines, the DOJ and DHS afforded Plaintiff that procedural right and issued determinations on Plaintiff's petitions. Plaintiff points to no language in either the IQA or its implementing guidelines suggesting that Defendants' IQA determinations implicate a legal right or obligation for purposes of an APA claim. *See Harkonen*, 2012 WL 6019571, at *12 (finding no final agency action for APA purposes because "the denial of Plaintiff's request for correction did not deny him a legal right."). Absent a showing that Defendants' IQA determinations give rise to legal consequences, Plaintiff fails to allege final agency action for purposes of an APA claim.

Plaintiff argues in a footnote that because it "raises procedure-based injuries, and not a right to informational correctness, the cases Defendants cite to establish that the IQA does not create a 'legal right to information or its correctness' are off base." (*See* Dkt. No. 41 at 16 n.6 (citing *Salt Inst.*, 440 F.3d at 159; *Harkonen*, 2012 WL 6019571, at *11).) Despite that assertion, however, the relief sought by Plaintiff's complaint demonstrates that Plaintiff's claim *is* premised on a purported right to informational correctness under the IQA that *Salt Inst.* and the district court in *Harkonen* squarely rejected. The complaint seeks declarations "that the Report disseminates information that fails the standard of quality required of federal agencies" and "that Defendants violated the IQA, its implementing Guidelines, and the APA," and an order requiring "Defendants to expressly retract or correct the Report and to cease dissemination of the Report." (Dkt. No. 1 at

19

32.) Plaintiff's opposition reiterates that Plaintiff's injury would be redressed by "[a] court order declaring that the Report fails to meet baseline information quality standards, that Defendants violated the IQA and the APA, and *ordering them to correct or retract and cease disseminating the Report*." (Dkt. No. 41 at 16 (emphasis added).) Simply put, Plaintiff's complaint does not seek redress for any "procedure-based injuries" but instead seeks correction of information. Such relief is unavailable under the APA.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' Rule 12(b)(6) motion to dismiss with prejudice to the extent Plaintiff challenges Defendants' refusal to correct the Report. Alleged violations of the IQA arising out of agency determinations regarding Plaintiff's requests for correction and reconsideration cannot form the basis of an APA claim. The Court is inclined to dismiss Plaintiff's complaint without leave to amend as Plaintiff's opposition does not suggest that Plaintiff could amend its complaint to correct any of the deficiencies noted by Defendants in their motion and the Court is not aware of how it could. Nonetheless, because the issue was not explored at oral argument, the Court will grant Plaintiff 30 days leave to file an amended complaint, provided Plaintiff believes in good faith that its amendment addresses the issues raised by the Court's Order. If Plaintiff instead simply disagrees with the Court's ruling, then the next steps are for the Court to enter judgment and for Plaintiff to pursue an appeal should it so choose. Accordingly, should no amended complaint be filed within 30 days of this Order, the Court will enter judgment.

This Order disposes of Docket No. 40.

**IT IS SO ORDERED.**

Dated: July 19, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge